UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT J.,[1]

                                    Plaintiff,           Case # 19-cv-709-FPG

v.                                                      DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.
_____

## INTRODUCTION

Plaintiff Robert J. protectively applied for Supplemental Security Income under Title XVI of the Social Security Act (the "Act") on or about February 29, 2016, alleging disability beginning February 25, 2015. Tr.[2] 10, 151. After the Social Security Administration ("SSA") denied his claim, Tr. 10, 75, Plaintiff appeared, with counsel, at a hearing on July 18, 2018, before Administrative Law Judge Timothy Belford (the "ALJ"). Tr. 23-55. On September 25, 2018, the ALJ issued an unfavorable decision. Tr. 10-18. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the SSA. Tr. 1-5. Plaintiff then appealed to this Court.[3] ECF No. 1.

The parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF Nos. 9, 15. Plaintiff filed a reply. ECF No. 16. For the reasons that follow, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and this matter is REMANDED for further proceedings.

---

[1] In accordance with this Court's November 18, 2020 Standing Order regarding the identification of non-government parties in social security decisions, available at https://www.nywd.uscourts.gov/standing-orders-and-district-plans, this Decision and Order will identify Plaintiff using only Plaintiff's first name and last initial.

[2] "Tr." refers to the administrative record in this matter. ECF Nos. 5, 5-1, 5-2.

[3] The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c)(3).

**LEGAL STANDARD**

**I.     District Court Review**

When it reviews a final decision of the SSA, it is not the Court's function to "determine *de novo* whether [the claimant] is disabled."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. §§ 405(g), 1383(c)(3)) (other citation omitted). The Commissioner's decision is "conclusive" if it is supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted).

**II.    Disability Determination**

To determine whether a claimant is disabled within the meaning of the Act, an ALJ follows a five-step sequential evaluation: the ALJ must determine (1) whether the claimant is engaged in substantial gainful work activity; (2) whether the claimant has any "severe" impairments that significantly restrict his or her ability to work; (3) whether the claimant's impairments meet or medically equal the criteria of any listed impairments in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and if they do not, what the claimant's residual functional capacity ("RFC") is; (4) whether the claimant's RFC permits him or her to perform the requirements of her past relevant work; and (5) whether the claimant's RFC permits him or her to perform alternative substantial gainful work which exists in the national economy in light of his or her age, education, and work experience.  *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1520, 416.920.

**DISCUSSION**

## I. The ALJ's Decision

The ALJ analyzed Plaintiff's claim for benefits using the process described above. At step one, the ALJ found that Plaintiff had not engaged in gainful activity since February 29, 2016, the application date. Tr. 12. At step two, the ALJ found that Plaintiff had the following medically determinable impairments: polysubstance abuse (alcohol and cocaine); affective disorder; osteoarthritis of the right knee; obesity; and inguinal hernia. Tr. 12. However, the ALJ determined that none of these medically determinable impairments were, alone or in combination, severe. Tr. 12-18. Therefore, the ALJ concluded the analysis and determined that Plaintiff was not disabled under the meaning of the Act. Tr. 18.

## II. Analysis

Plaintiff argues that remand is required because the ALJ erred in concluding that Plaintiff had no "severe" impairments of combination of "severe" impairments within the meaning of the SSA. The Court agrees.

Although Plaintiff bears the burden of proof at step two to establish that his impairments are severe, it is not a heavy burden. The Second Circuit has long held that "the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Where a claimant produces some evidence of an impairment, the Commissioner may conclude that the impairment is non-severe only where the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856, at *3 (1985).

Plaintiff met his burden at step two. The record is replete with references to Plaintiff's significant mental health issues, giving rise to a strong likelihood that they, alone or in combination, would have more than a minimal effect on Plaintiff's ability to work.

The ALJ apparently concluded that Plaintiff's impairments were non-severe based primarily on the opinion from the non-examining psychiatric medical consultant C.W. Kang, M.D., to which the ALJ gave "the most weight." Tr. 16. Dr. Kang acknowledged Plaintiff's self-reported bipolar, depression, anxiety, panic attacks, auditory hallucinations, post-traumatic stress disorder, schizophrenia, borderline personality, and mood swings, but concluded that the "mental allegations is [sic] very exaggerated." Tr. 1328. The opinion, which is littered with errors, indicates that Plaintiff "always said he has schizofrenia [sic] whoever asked him but he had very little symptom or sign of that. Usually most of the examiner [sic] conclude that he might have history of mood disoder [sic] or depressive disoder [sic]." Tr. 1328. Dr. Kang continued, "[c]ommon diagnosis was adjustment disorder. At times he come [sic] to the emergency room complaining suicidal thought [sic], medicine ran out and so forth but we have very little MER to back that up. Only consistent history is substnace [sic] abuse." Tr. 1328. Dr. Kang concluded that "[t]he claimant appears to have personality trait [sic]. Otherwise recurrent mild mood disorder. The impairment is not severe." Tr. 1328.

This opinion ignores the references, replete in the record, to Plaintiff's significant mental health issues simply because Dr. Kang believes that Plaintiff has exaggerated his symptoms. But those symptoms are well-documented over the course of multiple years. For example, Plaintiff has been hospitalized at least four times for psychiatric episodes. In September 2013, he was admitted to Erie County Medical Center upon "feeling very paranoid, hearing voices . . . and feeling like he needed to constantly be looking over his shoulder for whoever was after him." Tr.

274. He was diagnosed on admission with "[a]djustment disorder, schizophrenia by history, substance abuse, cocaine dependence, posttraumatic stress disorder by history," though the physician noted "significant inconsistences" in Plaintiff's history and potential drug seeking behavior. Tr. 273. Testing completed at that time was indicative for major impairments in mental functioning. Tr. 273. Plaintiff also admitted that he had jumped in front of a car in an unsuccessful attempt to kill himself. Tr. 273. He reported continued suicidal ideation without specific plan and auditory hallucinations. Tr. 273-74.

Nearly two years later, in July and August 2015, Plaintiff was again admitted for psychiatric treatment at Erie County Medical Center, this time with diagnoses of "Depression NOS, PTSD, ADHD, history of polysubstance abuse including cocaine, history of psychosis," but tested negative for all substances. Tr. 261. Related medical records suggested that Plaintiff was again "admitted for schizophrenia and suicidal ideations." Tr. 259.

Plaintiff was admitted to Erie County Medical Center for a third time in December 2017 and placed in "extended observation" for suicidal ideations and feelings of depression. Tr. 1436. He had racing thoughts and again intentionally stepped in front of a car. Tr. 1436, 1441.

Finally, in May and June 2018, Plaintiff received in-patient psychiatric care and substance abuse counseling at Conifer Park. Upon his discharge, after nearly a month at Conifer Park, Plaintiff was assessed with "cocaine use severe, schizoaffective disorder bipolar type, post traumatic stress disorder." Tr. 1332.

Since 2014, Plaintiff also received outpatient treatment for myriad mental health issues. Perhaps most disturbing, Plaintiff repeatedly reported auditory hallucinations and suicidal ideations. *See* Tr. 221, 307, 311. In August 2014, medical professionals tried to interview Plaintiff but he kept his head down during the entire interview, stating that the "blanket keeps . . . [him]

5

safe." Tr. 311. He reported not seeing a psychiatrist for two years. Tr. 311. In October 2015, the police were unable to interview Plaintiff because of his auditory hallucinations. Tr. 226. He reported hearing the voices of his deceased sisters. Tr. 221. And he reported having thoughts of hurting other people and "blowing his head off." Tr. 215. Nevertheless, one doctor indicated that Plaintiff was malingering. Tr. 220.

In summer 2016, Plaintiff denied auditory hallucinations, but was observed to be "mumbling incoherently." Tr. 499. His diagnosis was "unspecified psychosis not due to a substance or known physiological condition." Tr. 677. Even in 2017 and 2018, Plaintiff continued to have racing thoughts and hear voices. Tr. 465, 364. Spectrum Human Services evaluated his suicide risk as an eight, "high risk." Tr. 343. He continued to be paranoid and depressed. Tr. 1151.

It strikes the Court as implausible that years of homelessness, outpatient mental health treatment, substance abuse, documented auditory hallucinations, and multiple hospitalizations for suicidal and homicidal ideation do not compel at least some finding of severe impairment, even if some of Plaintiff's claims are exaggerated.

Moreover, by crediting Dr. Kang's opinion, the ALJ ignores these records, chalking them up to exaggerations. Tr. 15. But the records reveal a more complicated story; one of a deeply troubled individual. Indeed, multiple medical professionals, unlike Dr. Kang, had the chance to examine Plaintiff and came to different conclusions about Plaintiff's mental health. They repeatedly diagnosed him with significant, even debilitating mental health problems. Notwithstanding that those diagnoses may have been, at least in part, based on Plaintiff's self-reports, the medical professionals who documented them were also privy to Plaintiff's behavior in a way Dr. Kang, as a non-examining source, was not. Exaggerated or not, the record described

above warrants more scrutiny than a one-paragraph medical opinion from a non-examining medical source.

Nor does Dr. Kang's opinion, adopted wholesale by the ALJ, acknowledge the critical role Plaintiff's homelessness may play in his mental health. Instead, the ALJ weaponizes Plaintiff's homelessness and substitutes it as the cause of all of Plaintiff's problems, without recognizing that his homelessness may be the *result* of his psychiatric problems, thereby supporting the claim that they are indeed severe impairments. Moreover, the ALJ failed to entertain the possibility that Plaintiff's homelessness was a significant contributing factor in Plaintiff's inability to access care and treatment records. *Robinson v. Colvin*, No. 3:14CV1227 (HBF), 2016 WL 7668439, at *6 (D. Conn. Dec. 20, 2016), *report and recommendation approved*, No. 3:14CV1227 (MPS), 2017 WL 80403 (D. Conn. Jan. 9, 2017) ("Poverty, multiple incarcerations and homelessness is also a significant contributing factor in accessing care and treatment records."). At the very least, the ALJ should have further developed the record on this point or sought a consultative evaluation. *Cummings v. Berryhill*, No. 3:16CV01372 (RAR), 2017 WL 4337103, at *3 (D. Conn. Sept. 30, 2017) ("When, as here, the ALJ has highlighted alleged inconsistencies or gaps in the medical records it is incumbent upon the ALJ to contact the treating physician and develop the record." (citing *Rosa*, 168 F.3d at 79)).

The ALJ's errors are not harmless. The ALJ noted at the hearing that Plaintiff "would grid out" if he were limited to light work. Tr. 54. In addition, the hypotheticals posed to the vocational expert did not account for the impairments that the ALJ considered non-severe. To be sure, it is unclear what Plaintiff's RFC would be if his mental health issues were considered severe and factored into his work limitations. Remand is therefore required.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings, ECF No. 9, is GRANTED, the Commissioner's motion for judgment on the pleadings, ECF No. 15, is DENIED, and the matter is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of Court shall enter judgment and close this case.

IT IS SO ORDERED.

Dated: February 1, 2021
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court